## DECLARATION IN SUPPORT OF FORFEITURE

### I. Purpose of the Declaration

This Declaration is intended to be submitted in support of a civil complaint pursuant to 18 U.S.C. section 985 seeking the forfeiture of the following:

> 3744 Colliers Drive
> Edgewater, Maryland 21037-3410.

I submit that there is probable cause to believe that Trinity Health Care Services, Inc. ("Trinity") and Kathryn Inyang a.k.a. Kathryn Simon-Ogan a.k.a. Kathryn Ukpeh, and others have been engaged in activities constituting health care fraud, in violation of 18 U.S.C. section 1347, from at least 2010 up to and including the present, and that the Colliers Drive property was purchased at least in part with the proceeds of that fraud. I also submit that the Colliers Drive property was involved in money laundering transactions conducted in violation of 18 U.S.C. section 1957, and, therefore, the Colliers Drive property is subject to forfeiture pursuant to 18 U.S.C. section 981 (a) (1) (A) and (C).

### II. Affiant

I, Marisa L. Perez, am a Special Agent of the Federal Bureau of Investigation (FBI), and have been so employed for approximately sixteen years and have been assigned to the Baltimore Division. From August 1997 until the present, your affiant has been assigned to investigate violations of Federal law involving white collar violations, including economic crimes and health care fraud matters. Through training and experience, I have become familiar with the methods and techniques associated with economic crimes, including wire fraud, health care fraud, and the organization of economic conspiracies, and I have experience in tracing financial transactions.

### III. Applicable Statutes

Title 18 U.S.C. § 1347 (Healthcare Fraud)

1

(a) Whoever, knowingly and willfully executes, or attempts to execute, a scheme or artifice-
  (1) To defraud any health care benefit program; or
  (2) To obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program.

<u>Title 18, United States Code, §24, defines the term "health care benefit program" as follows:</u>

... any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

<u>Title 18 U.S.C. § 1957 (Money Laundering)</u>

(a) Whoever, [using transactions in the United States], knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall [have committed an offense.] [Health care fraud is a specified unlawful activity as defined in 18 U.S.C. sections 1956(c) (7) and 1961 (1) (A).]

<u>Title 18 U.S.C. section 981 (Asset Forfeiture)</u>

(a)(1) The following property is subject to forfeiture to the United States:

(A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section ... 1957 ... of this title, or any property traceable to such property.
  \* \* \*
(C) Any property, real or personal, which constitutes or is derived from proceeds traceable to ... any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title)[which includes health care fraud in violation of 18 U.S.C. section 1347], or a conspiracy to commit such offense.

**IV.    Probable Cause**

**INTRODUCTION**

Your affiant has participated in the investigation of the above-described offenses, and this affidavit is based upon my participation in this investigation, as well as reports made to me by other agents, officers, and state investigators of the U.S. Department of Health and Human Services Office of Inspector General ("HHS/OIG") and the State of Maryland Medicaid Fraud

Control Unit ("MFCU"). The information set forth in this affidavit is based on your affiant's own observations and review of documents, or reliable information provided to your affiant by other law enforcement and state investigators. Your affiant is setting forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested seizure warrant. Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim. This is a summary that is not meant to include each and every fact known to me.

On or about June 15, 2012, the Maryland Department of Health and Mental Hygiene (DHMH) contacted the MFCU to make a referral about allegations of fraudulent practices by Trinity. The referral was based on numerous complaints from current and former employees to the Maryland State Department of Education (MSDE) about the business practices of Trinity and its owner, Kathryn Inyang. The allegations included that Trinity was billing for services not rendered, at the direction of Kathryn Inyang, to the State of Maryland Medicaid program ("Maryland Medicaid").

I know from my training and experience that criminals often profit by submitting false billings to Maryland Medicaid for reimbursement. Maryland Medicaid knowingly pays only for services which are actually rendered. Providers are not permitted to bill for a service that was not provided, or at a greater level than that which was provided. The fraudulent claims that are submitted are primarily for services not rendered. These fraudulent billings are sent to Maryland Medicaid for processing and the payments are sent via wire into the criminal's account. I also know that Maryland Medicaid is a "health care benefit program," as defined by Title 18, United States Code, §24 and is administered by the DHMH in Baltimore City, Maryland. DHMH pays medical bills submitted by Medicaid providers with federal and state funds. Since fraudulent

bills or claims were submitted to Maryland Medicaid for services not rendered, the fraud, as outlined herein, was committed to defraud a health care benefit program in violation of 18 U.S.C. section 1347.

## THE MARYLAND MEDICAID AUTISM WAIVER PROGRAM

Maryland's Medicaid Autism Waiver Program ("Maryland Medicaid") is administered by the MSDE, under the auspices of the DHMH, which provides oversight to all waiver programs in Maryland, including the Autism Waiver Program. The Autism Waiver Program allows eligible children with autism spectrum disorder to receive necessary services to maintain them in their home and community. MSDE and Maryland Medicaid require providers to maintain records for all participants to include documentation of services (including staff timesheets, if necessary). Per Maryland Medicaid's Provider Agreement with Trinity, Autism Waiver Providers shall maintain and have available to the State personnel records and written documentation describing waiver services rendered, including dates and hours of services provided to participants, for a period of six years.

Individual Intensive Support Services (IISS) are required to be one-on-one services: one technician giving services to one autistic recipient. An autistic recipient may receive no more than 25 hours of IISS per week. The procedure code used to bill Maryland Medicaid when IISS are rendered is W9306. Respite Care services are also required to be one-on-one services. The procedure code used to bill Maryland Medicaid when Respite Care services are rendered is W9314. An autistic recipient may receive no more than 168 hours of Respite Care per six-month period. Family Training services involve the family of the autistic recipient. An autistic recipient (and family) may receive no more than 6 hours per day and 40 hours per year of Family Training. The procedure code used to bill Maryland Medicaid when Family Training services

are rendered is W9315. Therapeutic Integration (TI) services may involve one provider and no more than three autistic recipients. An autistic recipient may receive no more than 4 hours of TI services per day and no more than 20 hours per week. The procedure code used to bill Maryland Medicaid when TI services are rendered is W9307.

Trinity became a provider for services under Maryland Medicaid effective January 11, 2006, and was given Medicaid Provider Number 1302086-00. As a provider in the Medicaid Autism Waiver Program, Trinity is authorized to provide IISS, Respite Care, Family Training, and TI services to Autism Waiver Program participants up to the age of 21.

**TRINITY HEALTH CARE SERVICES CORPORATE OFFICERS**

Trinity Health Care Services, Inc. ("Trinity") is a Maryland corporation and registered with the Maryland State Department of Assessments and Taxation on December 30, 2004. The Articles of Amendment of Trinity received by the Maryland State Department of Assessments and Taxation on August 21, 2008, and filed on September 10, 2008, identify Kathryn Inyang and Usen O. Inyang as the corporation's directors, and are signed by Kathryn Inyang as Secretary (the signature of the president is not identifiable).

**TRINITY OFFICES**

Trinity had three office locations for providing services to the autistic recipients: 4701 Belair Road, Baltimore, Maryland (Baltimore City), 2211 Commerce Road, Suite 6, Forest Hill, Maryland (Harford County), and 4861 Tesla Drive, Suite F, Bowie, Maryland (Prince George's County).

**INYANGS' RESIDENCE**

Usen O. Inyang and Kathryn Inyang currently own a residential property at 3744 Colliers Drive, Edgewater Maryland 21037. This property was purchased in August 2009 for

$1,850,000. Maryland State Department of Assessments and Taxation records identify it as a principal residence. Bank loan documents concerning this purchase show that a loan in the amount of $1,295,000 was obtained for this purchase. An additional loan in the amount of $92,500 was also obtained in August 2009. Records reviewed also revealed that $200,000 of the deposit noted on the settlement statement for the loan came from accounts held by Kathryn and/or Usen Inyang's personal accounts.

On April 20, 2011, Kathryn and Usen Inyang obtained a refinance of the loan for 3744 Colliers Drive, Edgewater, Maryland 21037 from Bank of America in the amount of $1,392,000. From May 2011 through at least November 2012, regular payments were made towards the mortgage account held at the Bank of America. Most of the payments were sent via electronic debit from Bank of America account ending in 3130 ("3130"). A review of account records disclosed that 3130 is a checking account opened to Kathryn N Inyang and Usen O. Inyang in January 2007. Bank records pertaining to account 3130 indicate that the majority of the deposits are designated as: "Trinity Healthca Direct deposit." Some others are checks from Trinity marked as "distribution."

## USE OF FRAUDULENT TRINITY HEALTHCARE SERVICES PAYMENTS

## TRINITY HEALTHCARE ACCOUNT – 4156

Bank of America records pertaining to account ending in 4156 ("4156") indicate that this is a Business Investment Account opened to Trinity Healthcare Services on November 24, 2006, by Kathryn Inyang, CEO, and Usen Inyang, President. During the period June 2008 through September 2012, there were deposits in the amount of over $16.2 million into this account. Of those deposits, 185 of those deposits totaling over $15.1 million were identified as "State Vendor Payments" or "State of Maryland MMIS Interface/DHMH."

According to Maryland Medicaid paid claims data, from 2006 to September 2012, Trinity has been paid over $17,000,000 by the Maryland Medicaid Program. The Maryland Attorney General's Office informed your affiant that Maryland Medicaid payments to Trinity were sent to Trinity's 4156 account and are described as electronic State of Maryland payments on the bank statements.

### TRANSFERS FROM TRINITY HEALTHCARE ACCOUNT 4156 TO 0177

Bank of America records pertaining to account ending in 0177 ("0177") indicate that it is a Business Economy Checking account opened to Trinity Healthcare Services Inc. on November 24, 2006, by Kathryn Inyang, CEO and Usen Inyang, President. From November 2006 through October 2012, deposits totaling over $17.2 million were made to this account, and more than $15 million of those deposits were from the 4156 account.

### DEPOSITS INTO INYANGS' PERSONAL ACCOUNT 3130

Records pertaining to Bank of America account ending in 3130 ("3130") indicate that it is a checking account opened by Kathryn N. Inyang and Usen O. Inyang on January 12, 2007. During the period January 2007 through October 2012, more than $3 million was transferred into the 3130 account from the 0177 account.

### FUNDS FROM 3130 USED TO PAY MORTGAGE ON COLLIERS DRIVE RESIDENCE

Bank records show check payments from the 3130 account to Washington Savings Bank Mortgage Account number ending 0314 to pay for 3744 Colliers Drive mortgage payments. During the period from October 5, 2009 through April 4, 2011, those payments totaled $199,189.48.

ACH debits from 3130 to Bank of America "Mortgage" also show up in the 3130 records. From May 2, 2011 through October 3, 2012, there were 18 debits from 3130 in amounts

from $9,153.74 - $15,000 and totaling $223,460 towards mortgage payments; many of these were over $10,000 each. Thus, the total checks and debits towards the mortgage pertaining to 3744 Colliers Drive, including the ACH debits and the original $200,000 down payment, are approximately $400,000. Consequently, it is fair to conclude that funds from the Medicaid program moved into the 4156 account and then into the 0177 account, and thereafter into the 3130 account. From there about $400,000 was used to pay for the purchase and the mortgage on 3744 Colliers Drive.

### TRINITY EMPLOYEE INTERVIEWS

Prior to August 30, 2012, investigators from the MFCU and HHS/OIG conducted individual interviews of several current and former employees of Trinity. The employees described how Kathryn Inyang reviewed employees' timesheets and falsely increased the number of hours to be billed to the Maryland Medicaid program. In some cases, the total numbers of hours billed were more than the hours that the technicians actually worked during that same period, according to their timesheets. Employees told investigators that Kathryn Inyang oversaw the billing and would herself or direct Trinity billers to bill for the maximum number of TI services and then bill IISS and Respite Care, <u>regardless of the number of hours of services actually provided</u>. Employees also stated how Trinity technicians would fill in weekly timesheets in pen or pencil indicating the time and type of service provided to recipients. According to the employees, Kathryn Inyang would herself or direct other Trinity billers to review their timesheets and then <u>she or Trinity billers, at her direction, would write in with a marker some additional hours on days where no hours were listed by the Trinity technician</u>, or she or Trinity billers, at her direction, would write in with a marker <u>more hours than were listed</u>

by the Trinity technician. The investigative team has termed these timesheets as "marked timesheets."

## STATE SEARCH AND SEIZURE WARRANT EXECUTED AT OFFICES AND HOME

On August 30, 2012, Federal and State law enforcement officers executed a State Search and Seizure Warrant at Trinity's three office locations and the Inyangs' residence. During the execution of the warrants, law enforcement officers seized numerous marked timesheets at Trinity's office locations and Inyangs' residence.

## REVIEW OF MARKED TIMESHEETS CONFIRMS EMPLOYEES' ALLEGATIONS

Investigators reviewed these marked timesheets and found that Trinity consistently and routinely billed Maryland Medicaid: 1) for services on days where there is no indication that a Trinity technician saw the recipient; or 2) for more units of service (hours) than what the Trinity technician indicated that they actually provided.

This billing scheme meant that Maryland Medicaid was falsely billed for, and actually paid for services that were never provided. Agents reviewed just a small percentage of the seized marked timesheets and identified at least $900,000 that was paid to Trinity for services not rendered. The information that was written by the Trinity technician in what appeared to be pencil or pen was compared to what was written in dark marker type ink and then reviewed in the Maryland Medicaid paid claims database for Trinity. In many cases, there was no number written in at all by the Trinity technician for certain dates, which indicated that the Trinity technician didn't even see the recipient; however, there was information on those same sheets indicating the number of units worked in dark marker type ink. The Medicaid billing data indicated that the number of units appearing in the dark marker type ink is what was billed to,

<u>and paid by, Medicaid on dates of service where it appeared the Trinity technician did not provide services to the recipient.</u>

<u>EXAMPLES OF FRAUDULENT CLAIMS BASED ON TIME SHEET ANALYSIS</u>

On January 7, 2012, Maryland Medicaid paid $62,636.48 for health care claims submitted by Trinity. The payment was sent electronically into 4156 as a State vendor payment on January 13, 2012. An analysis of the timesheets supporting the payment made by Maryland Medicaid showed that about $20,000 of that deposit, about 30%, was for fraudulently submitted claims. One example, showing a seized, marked timesheet that appears to have been billed fraudulently, was for the week ending December 24, 2011, for Client A. The timesheet was for employee AB. That timesheet indicates that there were no times written for December 24, 2011, under any of the procedure codes. However, on the timesheet for employee AB, in dark marker type ink, the number "16" was written for the procedure code W9306 (IISS). The Maryland Medicaid claims database for service provider Trinity indicated the following billing to Maryland Medicaid and payment for service for Client A:

| Date of Service | Units | Procedure Code | Amt. Billed | Amt. Paid | Date Billed | Date Paid |
|---|---|---|---|---|---|---|
| 12/24/2011 | 16 | W9306 | $230.56 | $230.56 | 1/3/2012 | 1/7/2012 |

The Maryland Medicaid database reported the payment of $230.56 on January 7, 2012 which was then deposited into Trinity's 4156 account on January 13, 2012. Other timesheets supporting claims to Maryland Medicaid for that same date show that about $20,000 was paid for services billed but which did not have any hours written by the employee.

After the Maryland Medicaid payment of $62,636.48 on January 13, 2012 into 4156 of which about $20,000 was determined to be fraudulent, a $100,000 transfer was sent to 0177 on January 17, 2012. On January 18, 2012, two transfers from 0177 totaling $99,589.11,

one for $67,055.84 and another for $32,533.27, were made to ADP (Automatic Data Processing), the payroll processing company for Trinity. On January 31, 2012, two direct deposits were made from ADP into Inyangs' 3130 account, identified as $11,965.46 for Kathryn Inyang and another identified as $11,899.58 for Usen Inyang. The ADP payroll records list the Inyangs' 3130 account for payroll direct deposit. Bank records pertaining to the 3130 account indicate a directed debit payable to Bank of America as a mortgage payment on February 1, 2012, in the amount of $14,153.74.

The deposit into 4156 on January 13, 2012, contained health care fraud-related funds; those funds were first transferred into 0177, then to ADP, then to 3130 in the form of payroll direct deposits. The funds were then debited out of 3130 to make a mortgage payment for 3744 Colliers Drive, Edgewater, Maryland 21037. Consequently, these accounts, and the real estate itself, were involved in money laundering transactions in violation of section 1957 because the Inyangs knowingly moved health care fraud proceeds greater than $10,000 through the accounts in order to make a Bank of America mortgage payment for 3744 Colliers Drive, Edgewater, Maryland 21037.

On June 16, 2012, Maryland Medicaid paid $73,479.29 for health care claims submitted by Trinity. The payment was sent electronically into account 4156 as a State Vendor payment on June 22, 2012. The timesheets supporting the payment made by Maryland Medicaid showed that about $17,000 of that deposit was for fraudulently submitted claims. After the Maryland Medicaid payment of $73,479.29 on June 22, 2012, into account 4156, of which about $17,000 was determined to be fraudulent, bank records show a transfer of $100,000 on June 25, 2012, into account 0177. A check dated July 2, 2012, in the amount of $15,000 was paid from 0177 as a distribution and deposited into 3130.

Bank records for account 3130 indicate a directed debit payable to Bank of America as a mortgage payment on July 3, 2012, for $10,047.68. The deposit into account 4156 on June 22, 2012, contained health care fraud proceeds that were transferred first into account 0177, then to account 3130 in the form of a check drawn on account 0177, and then a directed debit out of 3130 was used to make a mortgage payment for 3744 Colliers Drive, Edgewater, Maryland 21037. Consequently, these accounts, and the real property itself, are involved in money laundering transactions in violation of section 1957 because the Inyangs knowingly moved health care fraud proceeds greater than $10,000 through the accounts in order to make a Bank of America mortgage payment for 3744 Colliers Drive, Edgewater, Maryland 21037.

Your affiant found hundreds of other similarly marked timesheets where there were no times written by the employee, but services were billed by Trinity for clients anyway. As is mentioned above, the amount paid by Maryland Medicaid for the services billed on these fraudulently billed claims totaled over $900,000.

Effective September 14, 2012, DHMH began withholding all Maryland Medicaid payments to Trinity. According to DHMH, they implemented the payment suspension due to credible evidence of the following allegations: 1) services billed were not provided according to Maryland regulations; 2) services billed were not provided; and 3) lack of or incomplete documentation of services billed.

## COMMINGLED FUNDS

Based on training and experience, I know that courts have held that there is no requirement that a substantial portion of the commingled funds in an account be derived from the criminal activity, so long as there is some evidence that some of the commingled funds were from criminal activity. United States v. Ward, 197 F.3d 1076 (11th Cir. 1999). The Fourth

Circuit has also stated that when funds are drawn from a commingled account, the government is entitled to a presumption that the transaction involves criminally derived funds. United States V. Wilkinson, 137 F.3d 214 (4th Cir. 1998).

I also know that in forfeiture cases, the probable cause standard is the same as that in search and seizure cases, requiring a court "to make a practical, common-sense decision whether, given all the circumstances set forth... there is a fair probability that the properties to be forfeited are proceeds of illegal ... transactions." United States v. Thomas, 913 F.2d 1111, 1114 (4th Cir. 1990) (drug case).

**FORFEITURE**

I also know that certain property is forfeitable to the United States to include property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity" as defined in 18 U.S.C. Section 1956(c)(7)(F) including any act or activity constituting an offense involving a Federal health care offense. 18 U.S.C. §§ 981. Pursuant to 18 U.S.C. Section 981(a)(1)(C), for purposes of proceeds forfeitable to the United States, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.

I also know that property is subject to forfeiture pursuant to 18 U.S.C. section 981(a)(1)(A) if it was involved in a money laundering transaction in violation of 18 U.S.C. section 1957. Because the above described real property constitutes proceeds traceable to the fraud offense and was also involved in money laundering transactions, it is subject to forfeiture pursuant to 18 U.S.C. section 981(a)(1)(A) and (C).

## CONCLUSION

Based on the foregoing, I believe that more than $900,000 was derived from proceeds traceable to violations of a federal health care offense, and that those proceeds can be traced to the purchase of, and payments for 3744 Colliers Drive, Edgewater, Maryland 21037. I believe that there is evidence to support a belief that the real property also was involved in money laundering transactions in violation of 18 U.S.C. section 1957, and should be forfeited to the United States pursuant to 18 U.S.C. section 981(a)(1)(A) and (C).

I declare, under penalty of perjury as provided in 28 U.S.C. section 1746 that the foregoing is true and correct to the best of my knowledge and belief.

*Marisa L. Perez*
Marisa L. Perez
Special Agent
Federal Bureau of Investigation